# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| CSH THEATRES, LLC, | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) ) | |
| v. | ) | |
| | ) | |
| NEDERLANDER OF SAN FRANCISCO ASSOCIATES, | ) ) ) | |
| | ) | |
| Defendant/Counterclaim Plaintiff. | ) ) ) ) | C.A. No. 9380-VCP |
| NEDERLANDER OF SAN FRANCISCO ASSOCIATES, | ) ) ) | |
| | ) | |
| Third Party Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| CSH CURRAN, LLC, CAROLE SHORENSTEIN HAYS and JEFF HAYS, | ) ) ) | |
| | ) | |
| Third Party Defendants, and | ) ) | |
| | ) | |
| SHORENSTEIN HAYS-NEDERLANDER THEATRES, LLC, | ) ) | |
| | ) | |
| Nominal Defendant. | ) ) | |

## MEMORANDUM OPINION

Date Submitted: December 3, 2014
Date Decided: April 21, 2015

Raymond DiCamillo, Esq., Blake K. Rohrbacher, Esq., Susan M. Hannigan, Esq., Rachel E. Horn, Esq., RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; David B. Tulchin, Esq., Brian T. Frawley, Esq., Lauren R. Mendolera, Esq., SULLIVAN & CROMWELL LLP, New York, New York; *Attorneys for Plaintiff/Counterclaim*

*Defendant CSH Theatres, LLC and Third Party Defendants CSH Curran, LLC, Carole Shorenstein Hays, and Jeff Hays.*

Bruce L. Silverstein, Esq., Tammy L. Mercer, Esq., Matthew C. Bloom, Esq., YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Matthew L. Larrabee, Esq., Michael H. Park, Esq. Benjamin M. Rose, Esq., DECHERT LLP, New York, New York; *Attorneys for Defendant/Counterclaim Plaintiff and Third Party Plaintiff Nederlander of San Francisco Associates.*

Elizabeth Wilburn Joyce, Esq., Gregory T. Donilon, Esq., Seton C. Mangine, Esq., PINCKNEY, WEIDINGER, URBAN & JOYCE LLC, Wilmington, Delaware; *Attorneys for Nominal Defendant Shorenstein Hays-Nederlander Theatres, LLC.*

**PARSONS, Vice Chancellor.**

In this case, the counterclaim plaintiff asks the Court to order specific performance of an alleged oral agreement to renew a long-running lease of a theater to a limited liability company ("LLC"). Breaches of fiduciary duty and the company's LLC agreement also are alleged, along with alternatively pled promissory estoppel and fraudulent inducement counts. The counterclaim and third-party defendants have moved to dismiss, arguing that the claims suffer from a host of legal shortcomings.

After rejecting the defendants' laches argument, this Memorandum Opinion analyzes the company's LLC agreement and considers whether certain of the defendants conceivably breached their fiduciary duties. In that regard, the LLC agreement appears to be ambiguous. Based on that conclusion and in light of the facts alleged, I decline to dismiss the breach of fiduciary duty claims, with the exception of a conclusorily pled waste claim. Next, I turn to the claims relating to an alleged oral agreement between the parties. The defendants contend that the purported lease renewal agreement is too indefinite to be enforced and is missing material terms. Based on the facts alleged, however, I conclude that it is reasonably conceivable that the counterclaim plaintiff could prove the existence and terms of the lease renewal agreement. The Memorandum Opinion then addresses a statute of frauds defense, but concludes that the part performance doctrine saves the breach of contract claim from dismissal.

Finally, I examine the alternatively pled promissory estoppel and fraudulent inducement counts. The promissory estoppel claim survives largely for the same reasons the breach of contract claim survives, but I dismiss the promissory estoppel claim against one of the defendants who is not alleged to have played any role in the alleged promise.

1

Last, this Memorandum Opinion considers the fraudulent inducement count. This claim is an impermissible bootstrap on the counterclaim plaintiff's breach of contract claim and, in any event, is pled in an entirely conclusory fashion. Accordingly, I dismiss that Count.

In sum, the motion to dismiss is granted in part and denied in part. Specifically, Counts I and V are dismissed in part, and Count III is dismissed entirely. In all other respects, the motion to dismiss is denied.

## I. BACKGROUND[1]

### A. The Parties and Other Actors

Nominal Defendant Shorenstein Hays-Nederlander Theatres LLC, a Delaware LLC ("SHN" or the "Company"), is a theater company in the business of providing venues for plays and other live performances in San Francisco. The Company began as, and continues to be, a collaboration between two families: the Nederlanders and the Shorensteins. Walter Shorenstein ("Mr. Shorenstein") and James Nederlander founded SHN's predecessor, a general partnership, in the mid-1970s. Mr. Shorenstein, a real estate developer, managed the brick-and-mortar aspects of the business, while James Nederlander and his brother Robert handled the scheduling and booking of shows, as well

---

[1] The facts, which are assumed true for purposes of this motion to dismiss, are drawn from the defendant's Amended Verified Counterclaims and Verified Third Party Complaint (the "Counterclaim and Third Party Complaint" or "C & TP Compl."), together with its attached exhibits and integral documents.

2

as other aspects of theater management. Using this division of labor, the Company operated quite successfully, at least until the events giving rise to this lawsuit.

The Shorenstein-Nederlander partnership was converted into SHN through a Plan of Conversion and Operating Agreement signed on November 6, 2000 (the "LLC Agreement"). Each family's fifty percent interest is owned by a business entity member of SHN: Nederlander of San Francisco Associates ("Nederlander") represents the Nederlanders and CSH Theatres LLC ("CSH") is the member on the Shorenstein side. The LLC Agreement contemplates a four-member board of directors to govern SHN, with each entity able to appoint two directors. CSH's representatives at all times relevant to this lawsuit have been Carole Shorenstein Hays ("Mrs. Hays") and her husband Jeff Hays ("Dr. Hays"). Mrs. Hays, who is Mr. Shorenstein's daughter, indirectly owns CSH as a trust beneficiary. Nederlander's appointees during the relevant period have been Robert E. Nederlander, Sr. ("Mr. Nederlander") and Raymond S. Harris. Dr. Hays, Mrs. Hays, Mr. Nederlander, and Harris together comprise the "Board."

The dispute in this case centers mainly on the Curran Theatre (the "Curran"), one of three San Francisco theaters that has been operated by SHN.[2] SHN and its predecessor have leased the Curran since the inception of the original Shorenstein-Nederlander partnership in the mid-1970s. As discussed *infra*, Mrs. Hays eventually purchased the Curran through a new corporate entity, CSH Curran, LLC ("CSH Curran").

---

[2] The other two theaters are the Orpheum and the Golden Gate.

3

In terms of party alignment, CSH originally filed this suit against Nederlander seeking a declaratory judgment. Nederlander counterclaimed against CSH and asserted third-party claims against CSH Curran, Mrs. Hays, and Dr. Hays. The pending motion to dismiss is directed against the Counterclaim and Third Party Complaint. For brevity and convenience, in this Memorandum Opinion, I will refer to CSH, CSH Curran, Mrs. Hays, and Dr. Hays collectively as "Defendants."

### B.    The Facts

### 1.    The Nederlanders and the Shorensteins

The Counterclaim and Third Party Complaint characterizes the relationship between the now-adversary families as one of near-total trust. Each family had an expertise, and each side "essentially exercised free rein over their respective responsibilities."[3] In fact, the original "partnership was operated under a single-page letter agreement for many years" before it was converted to an LLC.[4] For most of its existence, SHN apparently took a fairly lax approach toward business formalities and operated largely under a sort of gentleman's agreement with deals formalized by handshake rather than contract. In June 2010, however, Mr. Shorenstein passed away. Mrs. Hays then assumed management and control of CSH, including its interests in SHN. Around this time, she appointed herself and her husband as directors of SHN.

---

[3]    C & TP Compl. ¶ 27.

[4]    *Id.* ¶ 22.

The Counterclaim and Third Party Complaint characterizes Mrs. Hays as lacking her father's business acumen. Indeed, that pleading alleges that Mrs. Hays viewed her participation in SHN more as "an artistic hobby and as a means to promote her social status" than as a business endeavor.[5] The Counterclaim and Third Party Complaint describes Mr. Nederlander as having naively trusted his former business associate's daughter, only to have the rug pulled out from under him. The accuracy of these characterizations aside, the Counterclaim and Third Party Complaint makes clear that the relationship Mrs. Hays now has with Mr. Nederlander is far different from the essentially seamless cooperation her father had achieved with the Nederlander family.

### 2. The Curran controversy

The events giving rise to this lawsuit began in 2010. Sometime in late 2009 or early 2010, the owner of the Curran sought to sell that theater. Mr. Shorenstein entered into negotiations to purchase it, but that effort bore no fruit. Mr. Nederlander assumed the negotiating lead in January 2010 and successfully reduced the asking price from $30 million to under $20 million. Mr. Nederlander, however, still considered the price too high. At the same time, he did not want a competing interest to acquire and operate the theater. In that regard, Mr. Nederlander believed that "outside investors were readily available to purchase the Curran for the revised sale price and lease the theatre back to SHN for a percentage of the revenue."[6]

---

[5]     *Id.* ¶ 31.

[6]     *Id.* ¶ 39.

Mr. Nederlander spoke with Mrs. Hays about the status of the Curran by telephone during the third quarter of 2010. One of these telephone calls forms the crux of several of Nederlander's claims.[7] Nederlander alleges that Mrs. Hays rejected the idea of having third-party investors acquire the Curran and wanted to buy the theater herself. During the key call, Mrs. Hays allegedly asked Mr. Nederlander's permission to purchase the Curran. He consented on the alleged condition that the "Hays Group"[8] "agreed to continue SHN's lease of the Curran for the life of the Company."[9] Mrs. Hays allegedly accepted this condition, and Mr. Nederlander consented to her purchasing the Curran predicated on the lease-renewal promise.

According to the Counterclaim and Third Party Complaint, Mr. Nederlander never would have given permission to Mrs. Hays to purchase the Curran absent this agreement. With respect to the alleged promise to renew the lease, Nederlander alleges that "Nederlander and the Hays Group understood that the essential terms and framework for the lease continuation would be based on the terms of the existing lease, with price terms

---

[7] The Counterclaim and Third Party Complaint does not indicate whether there was only one relevant telephone call between Mr. Nederlander and Mrs. Hays or more than one. Regardless, Nederlander's claims focus on one specific call in the third quarter of 2010.

[8] The Counterclaim and Third Party Complaint at times refers vaguely to the "Hays Group," but never defines that term. It appears to refer to the Hayses and their controlled entities, but at times also may include business associates of the Hayses. On other occasions, the term appears to refer to one of the Hayses without specifying which one.

[9] C & TP Compl. ¶ 42.

6

to be finalized as the years progressed, reflecting normal, gradual increases through the years."[10] The Counterclaim and Third Party Complaint did not identify or include as attachments any contemporaneous documentary evidence supporting the existence of Mrs. Hays's alleged promise to renew the lease.

Mrs. Hays ultimately did acquire the Curran through a new business entity, CSH Curran. One of her trusts, the CSH Doule Trust, created CSH-Doule, LLC, which is the sole member of CSH Curran. Mrs. Hays and Tom Hart, a business associate of hers, co-manage CSH Curran. CSH Curran executed the agreement to purchase the Curran on November 30, 2010, for $16.6 million. On December 17, 2010, the Curran's former owner informed SHN that CSH Curran was the new owner and, therefore, would be SHN's new landlord. This arrangement produced no problems initially. CSH Curran and SHN continued to operate under the existing lease of the Curran, which had a term ending December 31, 2014. The parties, however, never were able to reduce the terms of a renewal of that lease to a final written contract.

According to Nederlander, the subject of the lease renewal was discussed at every SHN Board meeting after Mrs. Hays purchased the Curran at the end of 2010. The Board appears to have kept no minutes of those meetings.[11] The Hayses, however, allegedly

---

[10] *Id.* ¶ 45.

[11] Arg. Tr. 75 (counsel for SHN). No Board minutes were referenced in or attached to the Counterclaim and Third Party Complaint.

7

"always put off renewal and told Nederlander not to worry about the matter."[12]   At a January 2012 Board meeting, the Hayses stated that they would propose terms for the new lease soon, but failed to do so until August 2012.[13]   On August 29, 2012, an unidentified member of the Hays Group delivered to Nederlander an initial high-rent offer.  The Hays Group allegedly had prepared a high-rent offer, as well as a secondary low-rent proposal to be deployed after Nederlander's anticipated counteroffer.[14] Nederlander counteroffered on October 19, 2012, but thereafter the Hays Group did not engage in any meaningful further negotiations.

During this same period, Mrs. Hays allegedly mismanaged SHN's operations. More specifically, the Counterclaim and Third Party Complaint alleges that, from September 2012 onward, Mrs. Hays blocked lucrative business opportunities, such as sponsorships from Lexus, because they purportedly would detract from SHN's reputation.  According to Nederlander, Mrs. Hays in fact was more concerned with her own reputation.  At a January 2013 Board meeting, Mrs. Hays requested the opportunity to act as sole president of SHN, as opposed to continuing the usual co-presidency arrangement with one co-president from each of the Nederlander and Shorenstein families.  Nederlander agreed to a 60-day trial run.  The Counterclaim and Third Party

---

[12]     C & TP Compl. ¶ 55.

[13]     *Id.* ¶¶ 53-54.

[14]     The Counterclaim and Third Party Complaint portrays these negotiations as something of a formality, with all parties anticipating a similar final price, but nevertheless proceeding in an offer-counteroffer-compromise fashion.

Complaint described this period as an "unmitigated disaster" for the Company, during which SHN experienced "increased, frivolous spending with no corresponding benefit to the Company."[15] Nederlander opposed an extension of Mrs. Hays's sole presidency.

### 3. Mrs. Hays's "secret motives" revealed

On December 20, 2013—over a year after its initial lease counteroffer—Nederlander again sent the Hays Group its lease terms. The Hays Group did not respond. Instead, on January 28, 2014, the SHN Board met to discuss the lease renewal. At that meeting, Dr. Hays requested an executive session of the Board in which he asserted that CSH no longer could continue under the LLC Agreement and that "unless Nederlander agreed to give control of SHN to Mrs. Hays, the Curran lease renewal was off the table."[16] Despite having been unable for two years to finalize the new lease or cause Mrs. Hays to engage in serious discussion of the disputed lease terms, Nederlander alleges that it was "blindsided" by this "change of position and demands."[17] The Counterclaim and Third Party Complaint asserts that the January 28, 2014 meeting was the first time Nederlander "learned that Mrs. Hays had lied about her intention to continue leasing the Curran to SHN or, alternatively, that she had changed her mind and no longer intended to abide by the purchase-lease agreement" with Nederlander.[18]

---

[15]     *Id.* ¶ 34.

[16]     *Id.* ¶ 63.

[17]     *Id.* ¶ 64.

[18]     *Id.* ¶ 65.

According to Nederlander, the Hays Group's refusal to renew the lease did not result from an inability to finalize terms, because "all that needed to be finalized . . . were the rent schedules."[19] Instead, Nederlander alleges that the refusal revealed Mrs. Hays's desire to seize control of SHN. Nederlander rejected her demands and insisted on compliance with the oral agreement to renew the lease. On February 13, 2014, Harris spoke with Hart, who confirmed that the Hays Group would not renew the Curran lease. Hart also represented that the Hays Group had no current plans for the Curran. Nederlander sent a letter to the Hays Group on February 18, 2014, in which it "memorialized the history of the Curran purchase," detailed the harm to SHN, and accused the Hayses of breaching the LLC Agreement and their fiduciary duties.[20] In response, on February 21, 2014, CSH filed a Verified Complaint in this Court seeking a declaratory judgment that CSH would not be in violation of the LLC Agreement if the lease was not renewed (the "CSH Complaint"). Nederlander filed its initial Answer, Verified Counterclaims and Verified Third-Party Complaint on April 28, 2014.

### 4. Competing for shows in San Francisco

Nederlander always had expected to conclude a new lease and had booked shows at the Curran beyond the December 31, 2014 expiration date of the then-existing lease. Once Nederlander realized that the Curran would not be an SHN venue after December 31, SHN needed to relocate those shows that it already had booked at the Curran to its

---

[19]    *Id.* ¶ 67.

[20]    *Id.* ¶ 71.

10

other venues. With little leverage, SHN "was forced to accept less favorable terms in the revised agreement" for those shows.[21] Overall, SHN expects to lose more than a million dollars in profits as a result of the loss of the Curran lease. In addition, the Hayses allegedly have blocked lucrative theater sponsorships for SHN.

The Curran, however, was not destined to sit idle. On June 2, 2014, CSH revoked Mrs. Hays's appointment to the SHN Board. Notably, however, Dr. Hays remained on the Board. Days later, Mrs. Hays allegedly "began soliciting shows for the Curran and attempting to poach shows from SHN in direct competition with SHN."[22] According to the Counterclaim and Third Party Complaint, Mrs. Hays met with the producer of *A Gentleman's Guide to Love & Murder* on or about June 6. That show had never played at an SHN venue or been rejected by SHN. Additionally, at some later date, Mrs. Hays also met with Charlotte Wilcox, the producer of *Beautiful*, in an effort to attract that show to the Curran as well. The current post-Broadway production of *Beautiful* has neither run at an SHN venue nor been rejected by SHN. Moreover, the Counterclaim and Third Party Complaint alleges that during this same time period SHN was in negotiations with the same producers as Mrs. Hays to show their plays. Dr. Hays, as a Board member, received regular updates regarding SHN's operations, including show bookings. Similarly, Mrs. Hays allegedly had knowledge as to which shows SHN was attempting to book because of her service on the Board before June 2, 2014.

---

[21]     *Id.* ¶ 84.

[22]     *Id.* ¶ 90.

11

On July 29, 2014, Nederlander amended and filed the operative Counterclaim and Third Party Complaint. Defendants moved to dismiss on August 12 and, after full briefing, I heard argument on that motion, as well as co-pending motions to compel and to strike, on December 3, 2014 (the "Argument"). At the Argument, I granted the motion to strike. I also granted the motion to compel by oral decision on December 5, but reserved judgment on the motion to dismiss.

In its Counterclaim and Third Party Complaint, Nederlander alleges six counts against the various counterclaim and third-party defendants as follows:

- Count I for breach of fiduciary duty against Dr. Hays and Mrs. Hays;

- Count II for breach of LLC Agreement against CSH;

- Count III for fraudulent inducement against CSH and Mrs. Hays;

- Count IV for breach of contract against CSH and Mrs. Hays;

- Count V for promissory estoppel against CSH, CSH Curran, and the Hayses; and

- Count VI for declaratory judgment with respect to the LLC Agreement.

Defendants assert that these claims[23] suffer from numerous legal shortcomings and that they all should be dismissed. Among their most powerful arguments are those averring

---

[23]    Nederlander's declaratory judgment count, Count VI of the Counterclaim and Third Party Complaint, either is not at issue here, because it essentially is

12

that the statute of frauds bars any purported oral agreement and that any contract between the parties lacks essential terms and is insufficiently definite to be enforced. Defendants also contend that there was no reasonable reliance on Mrs. Hays's alleged promise, that Nederlander's interpretation of the LLC Agreement is flawed, and that laches bars many of the claims in the Counterclaim and Third Party Complaint.

## II. STANDARD OF REVIEW

Pursuant to Rule 12(b)(6), this Court may grant a motion to dismiss for failure to state a claim if a complaint does not assert sufficient facts that, if proven, would entitle the plaintiff to relief. As recently reaffirmed by the Supreme Court, "the governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[24] That is, when considering such a motion, a court must "accept all well-pleaded factual allegations in the Complaint as true . . . draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[25] This reasonable "conceivability" standard asks whether there is a "possibility" of recovery.[26] The court, however, need not "accept conclusory allegations unsupported by

---

duplicative of CSH's declaratory judgment count, or else is coextensive with Count II. The parties did not address Count VI in their briefing. Accordingly, I do not discuss Count VI further, and will treat it the same as Count II.

[24] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011) (footnote omitted).

[25] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002)).

[26] *Id.* at 537 & n.13.

specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[27]
Moreover, failure to plead an element of a claim precludes entitlement to relief and, therefore, is grounds to dismiss that claim.[28]

Generally, the Court will consider only the pleadings on a motion to dismiss under Rule 12(b)(6). "A judge may consider documents outside of the pleadings only when: (1) the document is integral to a plaintiff's claim and incorporated in the complaint or (2) the document is not being relied upon to prove the truth of its contents."[29]

## III.    ANALYSIS

### A.    Laches

Defendants assert that, even if Nederlander's claims had any merit, many of them are barred by laches. Defendants contend, and Nederlander apparently does not dispute, that each Count of the Counterclaim and Third Party Complaint would be governed by a three-year statute of limitations.[30] The Court of Chancery, of course, is not bound by statutes of limitations and instead follows the equitable doctrine of laches.[31] Generally, however, a "filing after the expiration of the analogous limitations period is

---

[27]    *Price v. E.I. duPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

[28]    *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 972 (Del. Ch. 2000) (Steele, V.C., by designation).

[29]    *Allen v. Encore Energy P'rs*, 72 A.3d 93, 96 n.2 (Del. 2013).

[30]    10 *Del. C.* § 8106.

[31]    *TrustCo Bank v. Mathews*, 2015 WL 295373, at *5 (Del. Ch. Jan. 22, 2015) (discussing the difference between laches and statutes of limitations).

14

presumptively an unreasonable delay for purposes of laches."[32]  In this case, Nederlander filed its initial answer, counterclaims, and third-party complaint on April 28, 2014. Presumptively, therefore, any of its causes of action that accrued before April 28, 2011, would be barred by laches.

At the motion to dismiss stage, however, it is not always possible to determine whether a claim is barred by laches.  "The timeliness of claims may be determined on a motion to dismiss if the facts pled in the complaint, and the documents incorporated within the complaint, demonstrate that the claims are untimely."[33]  Here, it is clear, for example, that the allegedly improper competitive behavior, *i.e.*, Mrs. Hays's attempts to steal shows from SHN, took place after April 28, 2011.  Accordingly, those claims, and any others based on conduct post-dating April 28, 2011, are not barred by laches.

The larger question is whether the claims relating to the Curran lease renewal, including those based on the alleged oral agreement made in the third quarter of 2010, are time-barred.  Based on the facts alleged, there are two potential agreements that Nederlander could be trying to enforce: (1) that Mrs. Hays could acquire the Curran with Nederlander's consent and had agreed to lease it to SHN for the duration of SHN's existence for terms essentially in conformance with the existing lease; or (2) that Mrs. Hays, with Nederlander's consent, could acquire the Curran and had agreed to negotiate

---

[32]   *Levey v. Brownstone Asset Mgmt., LP*, 76 A.3d 764, 769 (Del. 2013).

[33]   *CertainTeed Corp. v. Celotex Corp.*, 2005 WL 217032, at *6 (Del. Ch. Jan. 24, 2005) (footnotes omitted).

15

in good faith with Nederlander the renewal of a lease for the Curran that would extend for the duration of SHN. The latter formulation—which is not the version Nederlander emphasized in its briefing—probably would be an unenforceable agreement to agree or, alternatively, may have been satisfied by the parties' unsuccessful lease negotiations.[34] Accordingly, I understand Nederlander to be alleging the first version of the agreement and my analysis throughout this Memorandum Opinion is based on that conclusion.

Nederlander and Mrs. Hays allegedly entered into this oral agreement to renew the lease—construed as just stated—sometime in the third quarter of 2010. No progress was made on the negotiations until August 2012, when Mrs. Hays made her lease proposal. Up until that time, Nederlander alleges that it raised the issue, but the Hayses continually put off the subject of the lease renewal until a later date. Nederlander made a counteroffer in September 2012 that included a lower rent term, but did not hear back from the Hayses for over a year. During this time, Nederlander allegedly brought up the issue of the lease renewal at each board meeting, but the Hayses would defer consideration of it until later. This pattern suggests that Nederlander's counteroffer was not so far from the Hayses' target number as to warrant a flat-out rejection, and it reasonably can be inferred from these facts that the Hayses were giving Nederlander's offer serious consideration. Nederlander again sent the Hayses its negotiating position in

---

[34]    *See PharmAthene, Inc. v. SIGA Techs., Inc.*, 2008 WL 151855, at \*13 (Del. Ch. Jan. 16, 2008).

16

December 2013. Only thereafter, at a January 2014 board meeting, did Mrs. Hays reveal that the lease would not be renewed.

Defendants argue that because the purported oral agreement allegedly occurred in 2010, the claims based on that agreement are more than three years old and therefore are barred by laches. But, Nederlander's claim is for breach of contract. The facts alleged, construed in the light most favorable to Nederlander, do not provide any basis for inferring that Nederlander was on inquiry notice that Mrs. Hays would not renew the lease until the fall of 2012 at the earliest. Thus, the alleged breach of the agreement—the occurrence of which would trigger the running of the laches period—happened less than three years before Nederlander filed its claims, making the claims timely. In any event, based on the facts alleged, it is reasonably conceivable that Nederlander could prove that tolling would be appropriate in this case. Generally, there are at least three theories of tolling that can be invoked to avoid a laches defense: "(1) inherently unknowable injuries; (2) fraudulent concealment; and (3) equitable tolling. Each of these doctrines permits tolling of the limitations period where the facts underlying a claim were so hidden that a reasonable plaintiff could not timely discover them."[35] Nederlander argues that both the inherently unknowable injuries and the fraudulent concealment theories apply here.

---

[35] *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *5 (Del. Ch. July 17, 1998), *aff'd*, 725 A.2d 441 (Del. 1999).

I conclude that it is reasonably conceivable that Nederlander could show that the statute of limitations should be tolled in this case. According to the Counterclaim and Third Party Complaint, Nederlander first discovered on January 28, 2014, that Mrs. Hays either had decided to renege on her promise to renew the Curran lease or else had not intended to honor it in the first place. The Counterclaim and Third Party Complaint alleges that, until that point, the Hays Group had strung Nederlander along on the negotiations, continually putting the subject off for later discussion, an allegation that conceivably could support tolling on the basis of fraudulent concealment.

It is possible that Nederlander may have had inquiry notice earlier, such as in August 2012 when Mrs. Hays proposed a lease with a rent schedule significantly higher than the rent schedule of the existing lease. The Counterclaim and Third Party Complaint alleges, however, that Nederlander anticipated an initial high offer, but expected that it would be reduced following its own counteroffer. Nederlander made that counteroffer in September 2012.[36] The Hayses did not respond to Nederlander's counteroffer until January 2014, only a few months before the filing of Nederlander's initial counterclaim and third-party complaint. As the record develops, Defendants may show that

---

[36] The Counterclaim and Third Party Complaint does not specifically allege the terms of Nederlander's offer or the Hayses counteroffer. C & TP Compl. ¶ 54. Documents attached to Defendants' motion to dismiss, however, indicate that Nederlander proposed a twenty-year lease term starting at $375,000 and increasing to $500,000. Defs.' Mot. to Dismiss, Ex. D. The Hayses initially had proposed a ten-year lease term with rent beginning at $500,000 and rising to $800,000. Defs.' Mot. to Dismiss, Ex. C. Given the centrality of the lease renewal to Nederlander's claims, these documents are integral to the Counterclaim and Third Party Complaint, and therefore are properly before the Court on the pending motion.

18

Nederlander was on at least inquiry notice well before January 2014. At this stage, however, the record is insufficiently developed to allow a determination that, as a matter of law, the claims relating to the Curran conclusively are barred by laches.

Nederlander may have acted foolishly or displayed poor judgment in not pressing more promptly to secure a lease renewal for one of SHN's main venues. But, based on the facts alleged, it is reasonably conceivable that Nederlander could show that Mrs. Hays's or CSH's intentions in this regard were either inherently unknowable or fraudulently concealed. Thus, I decline to dismiss Nederlander's claims based on the alleged oral agreement for laches.

### B.      Breach of the LLC Agreement

Nederlander alleges that CSH breached the LLC Agreement, but the allegations supporting this Count focus largely on the actions of Dr. Hays and Mrs. Hays, who were not parties to that agreement. Among other alleged breaches, Nederlander asserts that the Hayses were competing directly with SHN, misappropriated SHN's confidential information, and used the Curran as a means of attempting to seize control of the Company. These same allegations underlie the breach of fiduciary duty claims discussed *infra*.[37] Defendants counter that this behavior is not barred by the LLC Agreement.

---

[37]    Indeed, the parties' briefing sometimes conflated the analysis of the breach of the LLC Agreement Count with the breach of fiduciary duty Count, making it difficult to disentangle these distinct theories of alleged wrongdoing. This Section focuses primarily on interpreting the LLC Agreement. The specific behavior underlying the alleged breaches is addressed in the next Section.

### 1. Contract interpretation at the motion to dismiss stage

The interpretation of a contract is a question of law.[38] "[D]efendants are not entitled to dismissal under Rule 12(b)(6) unless the interpretation of the contract on which their theory of the case rests is the 'only reasonable construction as a matter of law.'"[39] If there is more than one reasonable construction of contractual language, then the contract is ambiguous.[40] But, contractual language "is not ambiguous simply because the parties disagree on its meaning."[41] Instead, the Court will apply standard principles and canons of contract interpretation in construing the contract.

### 2. The LLC Agreement's provisions

The pivotal provisions of the LLC Agreement, for present purposes, are found in Article VII, entitled "Relationship Among Members."[42] As discussed below, these provisions arguably are ambiguous, mostly because of imprecision in certain defined

---

[38] *Seidensticker v. Gasparilla Inn, Inc.*, 2007 WL 4054473, at *2 (Del. Ch. Nov. 8, 2007) (citing *HIFN, Inc. v. Intel Corp.*, 2007 WL 1309376, at *9 (Del. Ch. May 2, 2007)); *see also AHS N.M. Hldgs., Inc. v. Healthsource, Inc.*, 2007 WL 431051, at *3 (Del. Ch. Feb. 2, 2007) ("Under general principles of contract law, interpretation of contractual language is purely a question of law.").

[39] *Kahn v. Portnoy*, 2008 WL 5197164, at *3 (Del. Ch. Dec. 11, 2008) (quoting *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 615 (Del. 2003)).

[40] *VLIW Tech.*, 840 A.2d at 615 ("Ambiguity exists 'when the provisions in controversy are reasonably or fairly susceptible of different interpretations.'" (quoting *Vanderbilt Income & Growth Assocs. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996))).

[41] *E.I. du Pont de Nemours & Co. v. Allstate Ins. Co.*, 693 A.2d 1059, 1061 (Del. 1997).

[42] CSH Compl., Ex. A [hereinafter "LLC Agreement"].

terms, and dismissal of this Count of the Counterclaim and Third Party Complaint therefore is not appropriate.

Sections 7.02 and 7.03 impose limits on each Member's behavior. Section 7.02(a) states:

> The Shorenstein Entity and the Nederlander Entity hereby agree to devote their efforts to maximize the economic success of the Company and to avoid any conflicts of interests between the Members. All actions of the Members and their representatives with regard to the Company and theater matters will be carried out in good faith and in a prompt and expeditious manner.[43]

Section 7.02(b) reads:

> Until the termination of the Company pursuant to this Agreement, neither the Shorenstein Entity nor the Nederlander Entity will stage any Production it controls (as defined in Section 7.03) within 100 miles of San Francisco unless (i) such Production has first played in one of the Theatres; or (ii) such Production has been rejected for booking at one of the Theatres by the other Member's representative on the Board of Directors; or (iii) the Company shares in the profits and/or losses of any booking pursuant to an agreement mutually acceptable to the Members.[44]

Additionally, Section 7.03 states:

> If either the Shorenstein Entity or the Nederlander Entity or any Affiliate thereof has control over a Production, that Production and the relevant Theatre will be accorded "most favored nation" treatment by the other in theater licensing arrangements. For purposes of this Section 7.03, "control over production" means the Person having the ability to

---

[43]     *Id.* § 7.02(a).

[44]     *Id.* § 7.02(b).

determine where the Production plays and the terms and conditions of said engagement.[45]

Section 7.06, subject to certain limitations, allows the Members to engage in certain competitive activities. Section 7.06 reads, in pertinent part:

> Subject to the other provisions of this ARTICLE VII, including Section 7.02, any Member, any Affiliate of any Member or any officer or director of the Company shall be entitled to and may have business interests and engage in business activities in addition to those relating to the Company, and may engage in ownership, operation and management of business and activities, for its own account and for the account of others, and may . . . own interests in the same properties as those in which the Company or the other Members own an interest, without having or incurring any obligation to offer any interest in such properties, businesses or activities to the Company or any other Member, and no other provision of this Agreement shall be deemed to prohibit any such Person from conducting such other businesses and activities.[46]

These provisions rely on various defined terms. The Members are the Shorenstein Entity and the Nederlander Entity.[47] The Shorenstein Entity is defined as CSH Theatres, LLC "together with any Permitted Transferees."[48] The Nederlander Entity is defined as Nederlander of San Francisco Associates "together with any Permitted Transferees."[49] The following related definitions all appear in Section 1.01 of the LLC Agreement. A

---

[45]    *Id.* § 7.03.

[46]    *Id.* § 7.06.

[47]    *Id.* § 1.01.

[48]    *Id.* Preamble.

[49]    *Id.*

22

Permitted Transferee is "(a) an Affiliate of any Member or (b) in the case of a Nederlander Entity, a Nederlander Controlled Entity or any member of the Nederlander family." Affiliate means a Person—"an individual or a corporation, all types of partnership, trust, unincorporated organization, association, limited liability company or other entity"—that "directly or indirectly through one or more intermediaries, Controls, is Controlled by or is under common Control with the subject Person." Control "means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, though contract, or otherwise." Finally, Production "means plays, musicals, or other events that typically play at any of the Theatres," with the Theatres being defined as "the Curran Theater, the Golden Gate Theater, the Orpheum Theater and any other theater then operated by the Company."

### 3. The LLC Agreement is ambiguous

The definitions just quoted reveal the problem: the family entities (the Members) are defined to include Permitted Transferees, which itself is defined to include Affiliates. Thus, according to Nederlander, any time the family entities are referred to in a provision of the LLC Agreement, Affiliates definitionally are included. Mrs. Hays, because of her alleged indirect control over CSH, is an Affiliate of CSH. Thus, Nederlander's position is that Mrs. Hays is included in the definitions of Members and the Shorenstein Entity and therefore is subject to the LLC Agreement's restrictions.

For Count II, the parties' briefing focused on the allegedly improper competition by Mrs. Hays in booking shows. In seeking dismissal of that Count, Defendants

23

emphasize that there are no allegations in the Counterclaim and Third Party Complaint that CSH, the actual party to the LLC Agreement, did anything improper. In this regard, Defendants deny that the Shorenstein Entity includes Affiliates. Indeed, one subsection of their brief is entitled: "'Shorenstein Entity' Means the Member [*i.e.*, CSH], and Not Any Affiliates."[50] For support, Defendants contend that the reference in the definition of the Shorenstein Entity to the term Permitted Transferee contemplates some form of future transfer from CSH to, for example, a successor entity within the defined set of Permitted Transferees. That successor entity would assume the Shorenstein Entity's interest in SHN. In other words, at any given point in time, the "Member" of SHN on the CSH side would be either the initial Shorenstein Entity or a Permitted Transferee, but not both. Defendants also point to the differences in the language in Sections 7.02(b) and 7.03. The restriction imposed in Section 7.02(b) is limited to the Nederlander Entity and the Shorenstein Entity, but in Section 7.03, the language is more expansive and includes "any Affiliate thereof." According to Defendants, this shows that the drafters of the LLC Agreement knew how to impose obligations on specific entities and their affiliates when they so chose, and their use of different language in Section 7.02(b) indicates that they intended to define the Shorenstein Entity more narrowly.

It is a standard canon of construction that interpretations that render certain contract language mere surplusage are to be avoided. "In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions

---

[50]    Defs.' Reply Br. 19.

therein, in order not to render any part of the contract mere surplusage, and, if possible, reconcile all the provisions of the instrument."[51] Inartfully drafted documents, however, may make it impossible to avoid rendering a specified term or terms superfluous and at the motion to dismiss stage "any ambiguity must be resolved in favor of the nonmoving party."[52] The LLC Agreement, read literally, defines the Shorenstein Entity to include Affiliates. Thus, even if Defendants' interpretation is plausible, I cannot say that it is the only reasonable one.

Resolving all ambiguities in favor of Nederlander as the nonmoving party, I must recognize that the LLC Agreement could be construed to impose restrictions on Affiliates of CSH, including Mrs. Hays. It is reasonably conceivable, therefore, that, when CSH's Affiliates' behavior is included in the analysis,[53] Nederlander could prove a breach of the LLC Agreement, such as a violation of the duty imposed in Section 7.02(a) requiring the Shorenstein Entity to work toward maximizing SHN's economic success. Thus, I decline to dismiss Count II.

## C.     Breach of Fiduciary Duties

The breach of fiduciary duty claims in Count I are asserted against the Hayses and focus on: (1) the competing shows; (2) the withholding of the Curran lease, (3) alleged

---

[51]     *Commercial Bank v. Global Payments Direct, Inc.*, 2014 WL 3567610, at *8 (Del. Ch. July 21, 2014) (internal quotations and footnotes omitted) (collecting cases).

[52]     *Kahn v. Portnoy*, 2008 WL 5197164, at *3.

[53]     Many of the relevant allegations of misconduct are discussed in the next Section.

25

misuse of confidential information; and (4) waste of assets. I address these claims in turn.

### 1. What fiduciary duties does the LLC Agreement impose?

The LLC Agreement was executed on November 6, 2000. The law of fiduciary duties in the alternative entity context, however, has been clarified substantially in the last fifteen years.[54] In the absence of language in an LLC agreement to the contrary, the managers of an LLC owe traditional fiduciary duties of care and loyalty.[55] The disputed issue in this case is: taking into account the terms of the LLC Agreement and the applicable default rules, what, if any, fiduciary duties did CSH or the Hayses owe to SHN or Nederlander? Defendants argue that the fiduciary duties owed by the Hayses are limited to those enunciated in the LLC Agreement. Relying on *Feeley*,[56] Nederlander argues in response that the LLC Agreement did not eliminate the duties of care and loyalty.

---

[54] Even in the last few years, the law of fiduciary duties in the alternative entity context has been evolving. *See, e.g.*, *Auriga Capital Corp. v. Gatz Props., LLC*, 40 A.3d 839, 849-56 (Del. Ch.) (stating that default fiduciary duties exist under the Delaware LLC Act), *aff'd*, 59 A.3d 1206, 1218 (Del. 2012) (holding that the comments in the court below about default fiduciary duties were "dictum without precedential value"). Recently, the Delaware Legislature resolved that issue by passing an amendment that provides for default fiduciary duties. 6 *Del. C.* §18-1104 ("In any case not provided for in this chapter, the rules of law and equity, including the rules of law and equity relating to fiduciary duties and the law merchant, shall govern.").

[55] *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 660 (Del. Ch. 2012).

[56] *See id.* at 660-64 (concluding that the LLC Act, 6 *Del. C.* § 18-1101, imposes default fiduciary duties and any attempt to limit or eliminate those duties must be clear and unambiguous).

Limited liability companies are creatures of contract, and the Delaware Limited Liability Company Act[57] states that "[i]t is the policy of this chapter to give the maximum effect to the principle of freedom of contract."[58] The drafters of an LLC agreement can modify the traditional duties of care and loyalty or displace them altogether, but they cannot eliminate the implied covenant of good faith and fair dealing.[59] Thus, if the LLC agreement does not modify or eliminate the traditional fiduciary duties, then those fiduciary duties still apply.[60] The starting point for determining what fiduciary duties apply is the governing contract between the parties.[61]

The relevant provisions of the LLC Agreement were quoted in Section III.B.2 *supra*. Section 7.02(a) imposes a contractual duty on the Members to "maximize the economic success of the Company and to avoid any conflicts of interests between the

---

[57]    6 *Del. C.* §§ 18-101 to 18-1109.

[58]    *Id.* § 18-1101(b).

[59]    *Id.* § 18-1101(c).

[60]    6 *Del. C.* § 18-1104; *2009 Caiola Family Trust v. PWA, LLC*, 2014 WL 7232276, at *8 (Del. Ch. Dec. 18, 2014) ("As a default rule, however, managing members of LLCs owe traditional fiduciary duties of loyalty and care.").

[61]    *Cf. DV Realty Advisors LLC v. Policemen's Annuity & Benefit Fund of Chi.*, 75 A.3d 101, 106-07 (Del. 2013) (quoting the "maximum freedom of contract" language in the Delaware Revised Uniform Limited Partnership Act ("DRULPA") and stating that the "analysis here must focus on, and examine, the precise language of the LPa that is at issue"); *Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 100 (Del. 2013) ("[W]e begin our analysis by examining what duties the Defendants owe to Encore's limited partners under this LPA's precise language."); *see also Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400, 418 (Del. 2013); *Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 360 (Del. 2013).

Members," and it also requires that "actions of the Members and their representatives with regard to the Company and theater matters will be carried out in good faith and in a prompt and expeditious manner."[62]  Section 7.02(b) limits when Members may put on competing shows within a 100-mile radius of San Francisco.  Finally, Section 7.03 defines control over production as: "the Person having the ability to determine where the Production plays and the terms and conditions of said engagement."[63]  By contrast, Section 7.06 allows the Members, any Affiliate, or any director or officer of SHN to engage in competitive activities, subject to the preceding limitations.  The question here, then, is whether the Counterclaim and Third Party Complaint alleges facts sufficient to allow a finding that it is reasonably conceivable that the Hayses violated their contractual fiduciary duties as they are articulated under the LLC Agreement.[64]

## 2. Nederlander's "consent"

Defendants first contend that any alleged fiduciary duty breaches arising from the operation of the Curran are barred by Mr. Nederlander having consented to Mrs. Hays's purchase of the Curran.  I reject this ground for Defendants' motion to dismiss because it requires resolution of disputed facts.  The Counterclaim and Third Party Complaint

---

[62]   LLC Agreement § 7.02(a).

[63]   *Id.* § 7.03.

[64]   In the previous Section, I concluded that the LLC Agreement was ambiguous on the issue of whether the term Members included Affiliates, an ambiguity resolved at this motion to dismiss stage in favor of Nederlander.  Accordingly, for purposes of analyzing the breach of fiduciary duty Count, the Hayses are subject to the same contractual duties as the Members.

alleges that Mr. Nederlander consented to the purchase of the Curran only on the condition that it would be leased back to SHN. Nederlander ultimately may fail to prove that allegation. At this procedural stage, however, I am required to take all non-conclusory allegations as true and draw reasonable inferences in favor of Nederlander. In accordance with that standard, there is no basis to conclude, as a matter of law, that Mr. Nederlander consented unconditionally to the activity about which Nederlander complains or that the condition he allegedly insisted upon was satisfied.

### 3. Section 7.07

Next, Defendants argue that Section 7.07 bars liability for any of the conduct alleged by Nederlander. Section 7.07 of the LLC Agreement states, in relevant part:

> No Member, officer, employee or director of the Company . . . shall be liable, in damages or otherwise, to the Company or any Member for any act or omission performed or omitted to be performed by it pursuant to the authority granted by this Agreement, except if such act or omission results from such person's own bad faith or willful misconduct (or, in the case of a Member, its gross negligence).

Relying upon Section 7.07, Defendants argue that Nederlander cannot plead a viable claim unless it pleads scienter. I disagree.

Section 7.07 appears to provide exculpation for negligent or grossly negligent actions, depending on the status of the actor. The Counterclaim and Third Party Complaint, however, alleges intentional violations of the duties imposed by Section 7.02, among other provisions. Violating the LLC Agreement by deliberately competing with SHN for shows, for example, is not an "act or omission performed . . . pursuant to" the LLC Agreement and therefore would not be conduct protected by Section 7.07.

29

Additionally, because of the ambiguity of the term Member and whether it includes Affiliates, Section 7.07 arguably requires only that the Hayses have acted with gross negligence for them to be liable. The allegations in the Counterclaim and Third Party Complaint portray a deliberate course of conduct by the Hayses—and Mrs. Hays in particular—to go into direct competition with SHN by hosting shows at the Curran. Based on these allegations, Nederlander conceivably could prove at least gross negligence. At this procedural stage, therefore, I cannot conclude that Section 7.07 bars Nederlander's fiduciary duty claims.

### 4. The competing shows

With respect to the alleged breaches of fiduciary duty pertaining to competing shows, Defendants argue that Mrs. Hays does not have "control over production" of those shows, as defined in Section 7.03. According to Defendants, the LLC Agreement distinguishes in this regard between producers and theater owners. Under this reading, only a producer has "control over production," and there are no allegations that Mrs. Hays is a producer. Nederlander counters that "control over production" means that both producers and theater operators have control over production. Assuming Defendants' contrary interpretation is a reasonable one, I find that it is not the only reasonable interpretation.

"Control over production" means "the Person having the ability to determine where the Production plays and the terms and conditions of said engagement."[65] It

---

[65] LLC Agreement § 7.03.

30

appears that neither a producer nor a theater owner unilaterally could set the terms of an engagement and pick the venue. Even with the most overbearing producer, the theater owner still would have to acquiesce to the terms; otherwise, the play would not be performed at that venue. Under Defendants' reading of Section 7.03, therefore, technically neither a producer nor a theater operator would have control over production unless the producer also owned the theater. It is questionable whether this extremely narrow interpretation is reasonable.

Nederlander's interpretation, on the other hand, finds additional support in Section 7.02(b). That provision states that "neither the Shorenstein Entity nor the Nederlander Entity will stage any Production it controls" within 100 miles of San Francisco, unless one of the three conditions is satisfied.[66] Because the family entities appear to be in the business of running theaters, rather than producing plays, the language and structure of Sections 7.02 and 7.03 seemingly contemplate shows being under one of the entities' "control" even though the entity controls only the venue. Thus, I consider Nederlander's reading of "control over production" to be reasonable. To the extent both parties' interpretations are reasonable, however, Section 7.03 is ambiguous, and dismissal therefore would not be appropriate on the present truncated record.

Additionally, I note that if Mrs. Hays's alleged efforts to poach SHN's shows does not fall squarely within the prohibition under Section 7.03, then such efforts conceivably could violate the duty to maximize SHN's economic success imposed by Section 7.02 of

---

[66]     *Id.* § 7.02(b).

the LLC Agreement. It is reasonably conceivable, therefore, that Nederlander could show that Mrs. Hays's effort to win shows away from SHN was inconsistent with maximizing SHN's economic success and a violation of her duties to SHN.

### 5. Withholding the Curran lease

Whether the withholding of the Curran lease breached a fiduciary duty imposed by the LLC Agreement largely depends on whether, because of contract or promissory estoppel, Mrs. Hays had an obligation to lease the theater to SHN. As an alternative theory, Nederlander contends that the Hayses violated their duty to maximize SHN's economic success by threatening to withhold the lease unless Mrs. Hays was made sole President of SHN and otherwise utilized excessive hardball tactics to effect change in the company's leadership structure. Because, as shown *infra*, Defendants' motion to dismiss the claims relating to the alleged oral agreement to renew the Curran lease must be denied, I decline at this stage to dismiss Nederlander's claim for breach of fiduciary duty and I need not address its alternative argument.

### 6. SHN's confidential information

The Counterclaim and Third Party Complaint specifically names two shows that Mrs. Hays attempted to poach for the Curran that were then being sought by SHN and further alleges that, while serving on SHN's Board, she acquired and misused confidential information as to the shows SHN was pursuing. These allegations state a

32

claim that Mrs. Hays misused SHN's confidential information.[67] Furthermore, Section 7.02(a) required the Hayses to avoid conflicts of interest. That Dr. Hays continued to serve on the Board while his wife was competing with SHN for the very same shows appears, on its face, to make it reasonably conceivable that the Hayses may have breached their contractual fiduciary duty to avoid conflicts of interest.

### 7.    Waste

The waste claim, in contrast, falls short of being reasonably conceivable and must be dismissed. "To recover on a claim of waste, a plaintiff must prove that the relevant exchange was 'so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration.'"[68] The Counterclaim and Third Party Complaint alleges that the Hayses blocked lucrative theater sponsorships in order to avoid detracting from Mrs. Hays's social status. These allegations are too conclusory to survive a motion to dismiss. Disagreements among the SHN directors as to what sponsorships should be attached to SHN's name and reputation are disputes about how to best manage the Company's business. I do not consider it reasonably conceivable that, based on the allegations in the Counterclaim and Third Party Complaint about the sponsorships, Nederlander could prove that that transaction was so one-sided that no reasonable businessperson would agree to it. Nederlander also alleges that Mrs. Hays

---

[67]    *Id.* § 7.09 (stating requirements for keeping SHN's confidential information secret).

[68]    *Zutrau v. Jansing*, 2014 WL 2014 WL 3772859, at *17 (Del. Ch. July 31, 2014) (quoting *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 74 (Del. Ch. 2006)).

mismanaged SHN during her 60-day trial period as sole President. An allegation of mismanagement without more, however, is not sufficient to state a claim for waste. Indeed, Nederlander in fact agreed to this brief trial run.

### 8.      Conclusion

For the reasons stated, I dismiss Nederlander's claim in Count I for waste of SHN's assets, but otherwise I decline to dismiss Count I.

### D.      The Curran Lease Renewal

I turn now to the most disputed Counts in the Counterclaim and Third Party Complaint, all of which relate to the alleged oral agreement to renew the Curran lease. Nederlander's breach of contract, promissory estoppel, and fraudulent inducement Counts are pled in the alternative, and all three Counts generally arise from the same factual allegations. Those allegations are reiterated below in the light most favorable to Nederlander as the nonmoving party.

SHN had a portfolio of three theaters, one of which was the Curran Theatre. SHN had leased the Curran for decades under the same lease, and that lease was set to expire on December 31, 2014. The then-owner had listed the Curran for sale in 2010. Mr. Nederlander looked into the property, but concluded the $20 million price was too high. He preferred instead to have friendly third-party investors acquire the property and lease it back to SHN. Mr. Nederlander had a phone conversation with Mrs. Hays in the third quarter of 2010 during which this information was conveyed to her, to the extent she was not already familiar with the situation because of her affiliation with SHN. Mrs. Hays, however, proposed buying the Curran herself. Mr. Nederlander allegedly agreed to Mrs.

34

Hays's proposal, but only on the condition that she lease the Curran back to SHN for so long as SHN exists.

The Counterclaim and Third Party Complaint avers that, after obtaining Mr. Nederlander's consent, Mrs. Hays proceeded to purchase the Curran in late 2010. Both parties allegedly assumed that the current lease would remain the operative contract and the rent for the new lease would continue to increase gradually in accordance with the existing rent schedule. According to the Counterclaim and Third Party Complaint, all other material terms of the future lease would be copied from the current lease. In reliance on this oral agreement, Nederlander continued booking plays at the Curran for periods extending beyond the December 31, 2014 expiration of the lease. The Counterclaim and Third Party Complaint also avers that, after 2010, Mrs. Hays strung Nederlander along by including the topic of the Curran lease in numerous Board agendas, but never allowing the negotiations to progress in any meaningful way. Finally, by her actions at the January 2014 Board meeting, Mrs. Hays allegedly revealed for the first time that she was reneging on the deal or else never had intended to abide by it in the first place.

### 1. Breach of Contract

I first analyze whether these alleged facts conceivably could support the existence of an enforceable agreement between Mrs. Hays and Nederlander. Defendants argue that the alleged promise was not sufficiently clear and definite to be enforceable and that the Statute of Frauds bars the agreement in any event. I address these arguments in turn.

35

### a. Was the alleged promise sufficiently clear and definite?

"It is well settled Delaware law that three elements are necessary to prove the existence of an enforceable contract: (1) intent of the parties to be bound, (2) sufficiently definite terms, and (3) consideration."[69] Here, Nederlander alleges that Mrs. Hays accepted the lease-back condition and in so doing manifested her intent to be bound. In terms of consideration, I find it reasonably conceivable that Nederlander's consent allowed what otherwise would have been a conflicted transaction to proceed. The LLC Agreement requires the Members "to avoid any conflicts of interests between the Members."[70] After purchasing the Curran, Mrs. Hays, through her affiliates, would be standing on both sides of the lease, giving her interests as both lessee and lessor. This leaves the issue of sufficiently definite terms. "[A]n enforceable contract must contain all material terms of the agreement and material provisions that are indefinite will not be enforced."[71] "If terms are left open or uncertain, this tends to demonstrate that an offer and acceptance did not occur."[72]

---

[69] *Gallagher v. E.I. duPont de Nemours and Co.*, 2010 WL 1854131, at \*3 (Del. Super. Apr. 30, 2010).

[70] LLC Agreement § 7.02.

[71] *Gallagher*, 2010 WL 1854131, at \*3; *see also PharmAthene, Inc. v. SIGA Techs., Inc.*, 2010 WL 4813553, at \*7 (Del. Ch. Nov. 23, 2010); *Ramone v. Lang*, 2006 WL 905347, at \*11 (Del. Ch. Apr. 3, 2006) ("[A] contract must contain all material terms in order to be enforceable.").

[72] *Ramone*, 2006 WL 905347, at \*11.

36

Defendants characterize the alleged oral promise as, at best, an unenforceable agreement to agree. In that regard, they focus on the purported lack of material terms. Even according to Nederlander's allegations, the rent schedule needed to be finalized. Several cases support the proposition that the rent term is an essential provision in a lease.[73] Before December 31, 2014, the parties attempted to finalize the rent term, but never settled on a number. It is tempting to conclude, as Defendants urge, that the absence of a fixed rent price term is fatal to Nederlander's claims. In the face of the other facts alleged, however, and cognizant that the precedents just cited all arrived at their conclusions at either the post-trial or summary judgment stages, I conclude that it would be premature to dismiss these claims based on the lack of a final rent term. In that regard, I note, for example, that the parties operated under the same lease for over thirty years.

Many of the authorities cited by Defendants in support of their motion to dismiss are distinguishable, at least under the facts as I must accept them at this procedural stage. Painted in the best light for Nederlander, the breach of contract claim is less about forming a new lease agreement from scratch and more about renewing the existing lease.

---

[73] *See Centreville Veterinary Hosp. v. Butler-Baird*, 2007 WL 1965538, at \*7 (Del. Ch. July 6, 2007) (noting the case conflict in other jurisdictions as to what a court should do where the rent term is missing, but ultimately not deciding the issue); *Heritage Homes of De La Warr v. Alexander*, 2005 WL 2173992, at \*3 (Del. Ch. Sept. 1, 2005) (stating that settled law requires that, for a contract to enter into a contract to be enforceable, all material and essential terms must be agreed upon, and finding that the price of a house to be constructed was such a missing term), *aff'd*, 900 A.2d 100 (Del. 2006) (TABLE); *The Liquor Exchange v. Tsaganos*, 2004 WL 2694912, at \*4 (Del. Ch. Nov. 16, 2004) (describing rent and duration as among "the most basic terms" missing from the supposed lease agreement).

Essentially, Nederlander alleges that the parties agreed to extend the term of an existing lease based on the same material terms, including the existing rent schedule. There is some support in the case law that an oral agreement to renew an existing contract requires somewhat less in terms of proof of a contract's terms than an agreement to form a new contract.[74] Presumably, this would be because both parties to a contract renewal already are familiar with the terms of the existing contract.

The SHN-Curran lease (the "Lease")[75] was effective from January 1, 1980, until December 31, 2014, and was amended only once, on October 31, 1997. A new entity associated with Mrs. Hays assumed the Lease and became SHN's landlord after Mrs. Hays acquired the Curran in mid-December 2010. The Lease included a rent schedule, which increased at regular intervals over the thirty-four-year term of the Lease from $120,000 to $350,000 per year.[76] The specified increases were nearly linear, and the rate

---

[74] *Cf. Harmon v. Del. Harness Racing Comm'n*, 62 A.3d 1198, 1201-02 (Del. 2013) (reversing trial court and reinstating jury verdict that found liability based on failure to abide by oral agreement to rehire the plaintiff in a case pursued under a promissory estoppel theory); *Keating v. Bd. of Educ. of Appoquinimink Sch. Dist.*, 1993 WL 460527, at *5-6 (Del. Ch. Nov. 3, 1993) (finding for the plaintiff and enforcing, on a promissory estoppel theory, an oral undertaking to rehire the plaintiff), *aff'd*, 650 A.2d 1305 (Del. 1994) (TABLE).

[75] A copy of the Lease was included with Defendants' motion to dismiss. Affidavit of Rachel E. Horn, Ex. B [hereinafter the "Lease"]. Consideration of this document is appropriate on this motion to dismiss, because the Lease is not being considered for the truth of what it asserts and because it is integral to the Counterclaim and Third Party Complaint. *See, e.g.*, *Allen v. Encore Energy P'rs*, 72 A.3d 93, 96 n.2 (Del. 2013); *In re Gen. Motors S'holder Litig.*, 897 A.2d 162, 168-69 (Del. 2006).

[76] Lease § 3.1(a).

of increase over time accelerated only slightly. In addition to the base rent, the landlord received from SHN a percentage share of the gross receipts from performances at the Curran. That revenue-sharing rate increased in a similar manner to the rent structure over time.[77]

Based on the Lease's detailed rent structure, I find it reasonably conceivable that Nederlander could show that, when Mr. Nederlander and Mrs. Hays made their oral agreement in 2010, both parties intended that the rent under the anticipated lease essentially would be an extrapolation of the rent schedule in the Lease for 2015 and future years.[78] As such, I conclude that the absence of a definitive rent schedule does not warrant dismissal of Nederlander's contract claims as a matter of law.

The lease of a well-established theater in a major metropolitan area in the United States also likely would include additional material terms beyond the rent. Defendants contend that the Lease itself, a thirty-page document with numerous detailed provisions, shows that there were other material terms missing. It appears from the Counterclaim and Third Party Complaint and Nederlander's arguments, however, that Nederlander's response to this problem is that the oral agreement between Mr. Nederlander and Mrs. Hays contemplated that the parties essentially would adhere to the same terms specified in the existing Lease. Absent an implicit agreement to that effect, I find that the oral

---

[77]     *Id.* § 3.2(a).

[78]     If the rent terms were plotted on a graph, a neutral observer would be able to extrapolate the rent for subsequent years with a fair degree of precision, if that observer assumed the same general rent structure would be used.

agreement would be too indefinite to be enforceable. Moreover, the Counterclaim and Third Party Complaint alleges that the only dispute between the parties relates to the rent term and, perhaps, the duration of the renewed lease. Based on the alleged agreement, Nederlander asserts that the new lease was to continue for the duration of SHN's existence. In the parties' actual negotiations, which had begun by at least October 2012, CSH sought a ten-year lease, while Nederlander allegedly sought a term of twenty years. When all of the evidence is in, this discrepancy may support a conclusion that there was no enforceable oral agreement between Nederlander and Mrs. Hays.

Nevertheless, although Nederlander may fail to satisfy its burden of proof at trial, I find it reasonably conceivable from the facts alleged in the Counterclaim and Third Party Complaint that Nederlander *could show* that the parties reached an oral agreement to renew the Lease based on the terms existing in that document for the duration of SHN's existence under the common ownership of Nederlander and CSH. Those terms included the rent schedule. In that regard, it conceivably could be shown that both parties anticipated that the rent schedule and revenue sharing provisions simply would continue to increase in line with the past increases. The allegation that the parties' initial offers differed by a not-insignificant amount cuts against this conclusion, but does not, in light of the other facts alleged, render Nederlander's theory inconceivable. Resolution of this issue must await a more developed record.

### b. Does the Statute of Frauds bar the alleged oral agreement?

Having concluded that the Counterclaim and Third Party Complaint adequately alleges an oral agreement to renew the Curran Lease, I turn to whether the Statute of

40

Frauds nevertheless precludes enforcement of that agreement. The Delaware Statute of Frauds prohibits enforcement of any agreement "upon any contract or sale of lands, tenements, or hereditaments, or any interest in or concerning them, or upon any agreement that is not to be performed within the space of 1 year from the making thereof," unless the agreement is in writing signed by the party to be charged.[79] Although at the time of the alleged agreement in 2010 the existing Lease still had four years to run and the renewal was to be for the duration of SHN, an entity that could exist indefinitely, the lease-renewal agreement does not fall within the one-year prohibition. "'The time within which such a contract is to be performed is reckoned from the making of the contract, not from the time performance is to begin.'"[80] In addition, "if a contract *may* be performed within a year, the statute does not apply."[81] In theory, Mrs. Hays could have purchased the Curran the day after making the agreement with Nederlander, signed documents relating to the renewed lease on the second day, and SHN could have been dissolved on the third day. As such, the agreement *could* be performed within one year,

---

[79]    6 *Del. C.* § 2714(a).

[80]    *Aurigemma v. New Castle Care LLC*, 2006 WL 2441978, at *2 (Del. Super. Aug. 22, 2006) (quoting 72 AM. JUR. 2d *Statute of Frauds* § 38).

[81]    *Brandner v. Del. State Hous. Auth.*, 605 A.2d 1, 1 (Del. Ch. 1991); *see also Guyer v. Haveg Corp.*, 205 A.2d 176, 181 (Del. Super. 1964) ("Delaware Courts have held that the statute of frauds does not apply to contracts of indefinite duration requiring the performance of a specific act which may be performed within one year even if performance within one year is unlikely."), *aff'd*, 211 A.2d 910, 912 (Del. 1965) ("It has been the law in Delaware for many years that the Statute of Frauds does not apply to a contract which may, by any possibility, be performed within a year.").

41

and the improbability of such a series of events—or, in this case, an actual factual record to the contrary—is irrelevant to the analysis.[82]

A lease, however, is an interest in land and the agreement therefore is covered by the Statute of Frauds.[83] Nederlander has presented no evidence of any written document, signed or unsigned, evidencing the alleged oral agreement. Indeed, Nederlander has not produced any board minutes, emails, or other documents in any way corroborating the existence of the lease-renewal agreement. As such, the Statute of Frauds prohibits enforcement of this agreement, unless one of the exceptions to the Statute of Frauds applies. Nederlander contends that two such exceptions apply here: (1) the part performance exception; and (2) what I will refer to as the estoppel exception. I discuss those exceptions next.

### i.     Part performance

Part performance is a well-recognized exception to the Statute of Frauds for contracts involving interests in land.[84] "Part performance may be deemed to take a contract out of the provisions of the statute of frauds on the theory that acts of performance, even if incomplete, constitute substantial evidence that a contract actually

---

[82]     *Guyer*, 211 A.2d at 912.

[83]     *See, e.g.*, *Hendry v. Hendry*, 2006 WL 4804019, at *7 (Del. Ch. May 30, 2006) ("The word 'interest' as it applies to land has been defined to include leasehold interests and rights."); *Bielo v. Del. Wild Lands, Inc.*, 1995 WL 106302, at *5-6 (Del. Ch. Feb. 8, 1995) (discussing a leasehold interest as covered by the Statute of Frauds).

[84]     Indeed, the part performance exception applies only to oral contracts involving interests in land. *Aurigemma*, 2006 WL 244197, at *3.

42

exists."[85]  "For the part performance exception to apply, however, the performance must be attributed solely to the oral agreement."[86]  That is, the acts said to constitute part performance must be unequivocal and "'must be of such a character that they can be naturally and reasonably accounted for in no other way than by the existence of some contract in relation to the subject matter in dispute.'"[87]  "Furthermore, the part performance exception . . . requires that the act of performance must be on the part of the complainant," and not the party to be charged.[88]

The part performance cases consistently hold that the part performance must constitute "action that is explainable only as part performance of the alleged oral contract,"[89] and not actions "equally consistent" with some other scenario.[90]  This strict requirement is in line with the policy underlying the Statute of Frauds, which is "to

---

[85]  *Quillen v. Sayers*, 482 A.2d 744, 747 (Del. 1984).

[86]  *Taylor v. Jones*, 2002 WL 31926612, at *4 (Del. Ch. Dec. 17, 2002).

[87]  *Langbord v. Wilson*, 1979 WL 175241, at *2 (Del. Ch. Oct. 30, 1979) (quoting *Rutt v. Roche*, 87 A.2d 805, 808 (Conn. 1952)).

[88]  *Teevan v. Kearns*, 1993 WL 1626514, at *3 (Del. Super. Dec. 3, 1993); *see also Sussex Inv. Co. v. Clendaniel*, 129 A. 919, 921 (Del. Ch. 1925) ("[T]he equity which underlies the doctrine of part performance must be by the party seeking the remedy.").

[89]  *E. Coast Resorts, Inc. v. Paroni*, 1990 WL 201399, at *5 (Del. Ch. Dec. 3, 1990).

[90]  *Langbord*, 1979 WL 175241, at *7; *see also Gebler v. Gall*, 1986 WL 11108, at *3 (Del. Ch. Sept. 4, 1986) ("The course of conduct of plaintiffs disclosed by the evidence is every bit as consistent with defendant's version of their mutual understanding as it is with a claim that they had a legal right to the property or at least to remain in the property rent-free.").

43

protect defendants against unfounded or fraudulent claims that would require performance over an extended period of time."[91]

Here, Nederlander's "performance" was not partial, it was complete. He gave permission to Mrs. Hays to purchase the Curran on the condition that she lease it back to SHN. Defendants contend that this performance falls woefully short of what is required for part performance. In particular, Defendants emphasize the case of *Sargent v. Schneller*,[92] which involved an alleged oral contract for the sale of a house. There, the Court found insufficient evidence of part performance by the plaintiff, even though the plaintiff: (1) had received a key to the property; (2) had done some yardwork; and (3) paid some of the defendant's legal fees. But, *Sargent* is distinguishable. First, that case was a post-trial opinion. It did not address, therefore, whether the plaintiff's allegations would have sufficed to move beyond the pleadings stage. Second, the evidence in *Sargent* of part performance was minimal: the yardwork consisted of a few hours on two days; the legal fees amounted to only $68; and the defendant merely sent the plaintiff a key to enable him to examine a property that was on the market.

The problem with Defendants' argument here is that they look only to Nederlander's consent, which they contend proves nothing on its own. While this may be

---

[91]    *Olson v. Halvorsen*, 982 A.2d 286, 291 (Del. Ch. 2008), *aff'd*, 986 A.2d 1150 (Del. 2009).

[92]    2005 WL 1863382 (Del. Ch. Aug. 2, 2005).

true, the "alleged . . . promise should not be viewed in a vacuum."[93]  The Counterclaim and Third Party Complaint alleges that SHN originally contemplated buying the Curran because it feared that it would be acquired by a competitor.  Finding the price too high, Nederlander hoped that some friendly third-party investor would purchase the Curran and lease it back to SHN.  It was in this context that the alleged oral agreement was made.  Thus, taking as true the allegations in the Counterclaim and Third Party Complaint, SHN's goal was to encourage a purchase by a new owner—whether SHN itself or a friendly third party—that would lease the Curran Theatre back to SHN on favorable terms.  These allegations make it reasonably conceivable that the only way Nederlander would have consented to Mrs. Hays's acquisition of the Curran was if she agreed to lease it back to SHN.  Furthermore, Mrs. Hays arguably needed Mr. Nederlander's consent in order to complete the transaction because of the LLC Agreement's requirement that she avoid conflicts of interests.[94]  That consent was given.  Thus, although the evidence ultimately may not bear out Nederlander's claim in this regard, it is at least conceivable that it will.

Moreover, and perhaps more importantly, Defendants have not advanced a convincing alternative explanation for Nederlander's consent.  They simply assert that Nederlander's performance was inadequate.  The cases that have found putative part performance inadequate to avoid the Statute of Frauds, however, have involved conduct

---

[93]  *Konitzer v. Carpenter*, 1993 WL 562194, at *9 (Del. Super. Dec. 23, 1993).

[94]  LLC Agreement § 7.02(a).

that is equally consistent with another explanation, such as that the defendant entered into a lease rather than an installment purchase agreement. SHN had leased the Curran for over thirty years and it is defined as one of SHN's three Theatres in the LLC Agreement. Defendants have proffered no alternative explanation as to why Nederlander voluntarily would have allowed a third party, like Mrs. Hays, to acquire the Curran without ensuring that SHN still could lease the property on reasonable terms.

### ii.    Estoppel

Nederlander also contends that the alleged oral agreement is enforceable under a second exception to the Statute of Frauds. Yet, briefing on this issue was unclear. Nederlander suggested that the purported second exception either is or is similar to promissory estoppel. From a jurisprudential standpoint, it would be rather odd if promissory estoppel were an exception to the Statute of Frauds, because the two concepts serve different purposes. Promissory estoppel technically is a substitute for consideration that the courts employ to avoid injustice,[95] while the Statute of Frauds doctrine concerns itself with whether an otherwise valid agreement is rendered unenforceable because of the lack of a signed writing. Generally speaking, a necessary predicate for the application of promissory estoppel is the nonexistence of a contract between the parties. As such, it seems debatable whether this exception actually exists or whether, instead, it is simply a

---

[95]    *See Lord v. Souder*, 748 A.2d 393, 404-05 & n.5 (Del. 2000) (Lamb, V.C., sitting by designation, concurring) (distinguishing contract analysis from promissory estoppel, under which there is no bargained-for exchange).

specific application of the promissory estoppel analysis, which is a separate inquiry from whether an agreement complies with the Statute of Frauds.

There is some support in the case law, however, that the exception Nederlander argues for actually does exist. In *Taylor v. Jones*, Justice Jacobs, writing as a Vice Chancellor, stated that there are two exceptions to the Statute of Frauds: "(i) where the agreement has been partially performed and (ii) where a party has been induced to act by reliance on a promise."[96] With respect the latter, then-Vice Chancellor Jacobs stated that "the second exception to the statute arises where there is conduct that amounts to a promissory estoppel."[97] In *Huntington Homeowners Ass'n, Inc. v. 706 Investments*,[98] Vice Chancellor Noble noted that: "'An oral promise or representation that certain land will be used in a particular way, though otherwise unenforceable, is enforceable to the extent necessary to protect expenditures made in reasonable reliance upon it.'"[99] This decision does not appear to create a broad exception to the Statute of Frauds, but rather it contemplates a limited equitable remedy in the context of an otherwise unenforceable promise relating to land.[100]

---

[96]     *Taylor*, 2002 WL 31926612, at *4.

[97]     *Id.*

[98]     1999 WL 377827 (Del. Ch. May 28, 1999).

[99]     *Id.* at *3 (quoting *Restatement of Property* § 524).

[100]    Another case along the same lines, which was not cited by the parties, is *Walton v. Beale*, 2006 WL 265489 (Del. Ch. Jan. 30, 2006), which spoke of an exception to the Statute of Frauds that derives from equitable estoppel. That exception, which the Court found applicable, requires the party invoking it to show "that they lacked

47

Because I find the part performance exception sufficient here to defeat Defendants' argument that the alleged oral agreement is barred by the Statute of Frauds and because Nederlander's promissory estoppel claim is addressed in the following Section, I need not address this second exception any further.

### c. Conclusion

In sum, I conclude that it is reasonably conceivable that the alleged oral agreement to renew the Curran Lease, construed to be as I have described it, is sufficiently clear and definite to be enforceable. In addition, I find that at least the part performance exception to the Statute of Frauds plausibly saves the alleged oral agreement from being unenforceable for lack of a writing. Accordingly, I deny Defendants' motion to dismiss Count IV.

### 2. Promissory Estoppel

In the alternative, Nederlander avers that the Court should enforce Mrs. Hays's representation that she would renew the Curran Lease under the doctrine of promissory estoppel. Unlike a breach of contract claim, promissory estoppel has a higher burden of proof and some different elements:

> In order to establish a claim for promissory estoppel, a plaintiff must show *by clear and convincing evidence* that: (i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the

---

knowledge or the means to obtain knowledge of the facts in question, relied on the conduct of the party against whom the estoppel is claimed, and suffered a prejudicial change of position as a result of that reliance." *Id.* at *4 (citing *Heckman v. Nero*, 1999 WL 182570, at *3 (Del. Ch. Mar. 26, 1999)).

promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise.[101]

Several of the elements of promissory estoppel correspond to the requirements for Nederlander's breach of contract claim. Defendants' main argument against the promissory estoppel claim, for example, is that the alleged promise is insufficiently clear and definite. I rejected that argument in Section III.D.1.a *supra* for reasons that apply at least equally in the context of a clear and convincing evidence standard of proof. Thus, the Counterclaim and Third Party Complaint adequately alleges a promise by Mrs. Hays to renew the lease. Additionally, it is reasonable to infer from the facts alleged that Mrs. Hays made that promise to induce Nederlander to grant her permission to purchase the Curran. This leaves the remaining two elements, each of which Defendants also contest. None of their objections, however, warrant dismissal at the pleadings stage.

Nederlander alleges that it relied on Mrs. Hays's promise both in granting permission for her to purchase the Curran and in booking shows for SHN at the Curran beyond the December 31, 2014 expiration of the Lease. Defendants challenge the reasonableness of Nederlander's reliance for at least three reasons: (1) the lack of essential terms makes any reliance unreasonable; (2) reliance upon a promise to enter into a lease in the future is unreasonable as a matter of law; and (3) the Statute of Frauds

---

[101] *Lord*, 748 A.2d at 399 (emphasis added).

renders reliance unreasonable as a matter of law. I do not find any of these arguments persuasive.

First, I previously concluded that Nederlander conceivably could show that both parties understood that the necessary terms for a new lease would be the same as or similar to the terms of the existing Lease. Thus, for example, the existing Lease would provide a basis for determining the rate of increase in future rents. Accordingly, the Counterclaim and Third Party Complaint does not merely allege reliance on a "vague assurance,"[102] as Defendants contend. Second, I find unpersuasive Defendants' argument about impermissible reliance on statements of future intent. Except in an immediate exchange, virtually all agreements involve future action, *e.g.*, "I promise to sell you this car tomorrow when you come back with a certified check." Here, Mrs. Hays allegedly made an unconditional promise to renew the Lease. Thus, even assuming Delaware law comports with the federal authorities cited by Defendants for the proposition that "reliance upon a mere expression of future intention cannot be 'reasonable,' because such expressions do not constitute a sufficiently definite promise,"[103] that simply is not the situation here. Mrs. Hays's alleged promise was an unconditional promise to renew, not a statement that she expected or intended to renew the Lease. Third, the Statute of Frauds does not categorically render reliance upon an oral promise to renew a lease either

---

[102]      *See Copeland v. Kramarck*, 2006 WL 2521444, at *3 n.26 (Del. Ch. Aug. 23, 2006).

[103]      *In re Phillips Petroleum Sec. Litig.*, 881 F.2d 1236, 1250 (3d Cir. 1989).

unreasonable or unenforceable. Indeed, as discussed in Section III.D.1.b.i *supra*, Nederlander adequately has alleged that the part performance exception took the disputed oral agreement outside of the Statute of Frauds. For the same reasons, I consider it reasonably conceivable that Nederlander could show based on the facts alleged in the Counterclaim and Third Party Complaint that it reasonably relied to its detriment on Mrs. Hays's alleged oral promise notwithstanding the Statute of Frauds.

Defendants also weakly assert that there would be no injustice if Mrs. Hays's promise were not enforced. This argument largely is premised on Defendants' previous arguments for finding the alleged promise unenforceable. Having rejected those arguments individually, I also reject the attempt to repackage and relabel them as "injustice."[104]

Finally, Defendants argue that the promissory estoppel claims fail as a matter of law against CSH Curran, CSH Theatres, and Jeff Hays because the Counterclaim and Third Party Complaint focuses only on Mrs. Hays's alleged promise. I have no trouble concluding that CSH Curran should remain subject to this Count. After Mrs. Hays made the alleged promise, she formed CSH Curran to acquire the Curran. If Nederlander succeeds in proving its claim, Mrs. Hays should not be able to avoid her obligations under the promise because she *subsequently* created a wholly controlled entity to effect

---

[104] Defendants also aver that the true injustice here is that Mrs. Hays paid $16.6 million dollars for the Curran and that Nederlander seeks to have this Court tie her hands indefinitely in the use of her property. But, this Memorandum Opinion deals with whether the claims as alleged are legally deficient. Whether Nederlander will be able to prove its claims remains to be seen.

the acquisition. As to CSH Theatres, Nederlander argues that Mrs. Hays was acting as an agent of CSH Theatres when she made the promise.[105] Ultimately, the facts may show that Mrs. Hays acted solely on her own behalf. At this point, however, the Counterclaim and Third Party Complaint alleges a sufficiently close relationship between Mrs. Hays and the various CSH entities to make it reasonably conceivable that Nederlander could show that Mrs. Hays acted pursuant to some sort of agency relationship. Accordingly, I decline to dismiss this Count against CSH Theatres. Dr. Hays is another story. A person is not liable simply because his spouse made a promise to do something. The Counterclaim and Third Party Complaint contains no conspiracy or aiding and abetting allegations or counts, and Nederlander offers no explanation as to why Dr. Hays should be held accountable for Mrs. Hays's alleged promise. Thus, I decline to dismiss Count V, except as against Dr. Hays.

### 3. Fraudulent Inducement

Nederlander also alleges, in the alternative, that the promise to renew the Curran Lease constituted fraudulent inducement. There are five elements required to state a claim for fraudulent inducement:

> (1) a false representation of material fact; (2) the defendant's knowledge of or belief as to the falsity of the representation or the defendant's reckless indifference to the truth of the representation; (3) the defendant's intent to induce the plaintiff to act or refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the

---

[105] *See Harmon*, 62 A.3d at 1201 (describing recognized forms of authority pursuant to which an agent can bind the principal).

representation; and (5) damages to the plaintiff as a result of such reliance.[106]

I already have discussed the substance of elements three, four, and five in the course of analyzing the promissory estoppel claims *supra*. I focus, therefore, only on the first two elements. I also note that fraudulent inducement must be pled with particularity in accordance with Court of Chancery Rule 9(b). Defendants contend that the Counterclaim and Third Party Complaint fails to plead either the first or second elements of fraudulent inducement with the requisite specificity.

Rule 9(b) states: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally."[107] Cases interpreting the Rule 9(b) requirement have held that a complaint must allege "(1) the time, place, and contents of the false representation; (2) the identity of the person making the representation; and (3) what the person intended to gain by making the representations."[108] The "particularity requirement must be applied in light of the facts of the case, and less particularity is required when the facts lie more in the knowledge of the opposing party than of the pleading party."[109] "Essentially, the plaintiff is required to

---

[106] *Haase v. Grant*, 2008 WL 372471, at *2 (Del. Ch. Feb. 7, 2008) (footnotes omitted).

[107] Ct. Ch. R. 9(b).

[108] *Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006).

[109] *H-M Wexford LLC v. Encorp, LLC*, 832 A.2d 129, 146 (Del. Ch. 2003).

allege the circumstances of the fraud with detail sufficient to apprise the defendant of the basis for the claim."[110]

Here, the Counterclaim and Third Party Complaint alleges that, during a phone conversation in the third quarter of 2010, Mrs. Hays represented to Mr. Nederlander that she would renew the Curran Lease with SHN. As a result of this purported misrepresentation, she gained Nederlander's consent and the ability to purchase the Curran Theatre. Although the exact date is missing, the requirements of Rule 9(b) are satisfied in that Defendants have been apprised of the circumstances of the alleged fraud and the basis for Nederlander's claims.

The more difficult issue is whether Nederlander's Counterclaim and Third Party Complaint sufficiently alleges the first two elements of the fraudulent inducement standard. Nederlander alleges, alternatively, that when Mrs. Hays represented that she would renew the Curran Lease, she either knew that representation was false when she made it or later changed her mind. Only the former pleading, however, could support Nederlander's fraudulent inducement claim as a matter of law, because such a claim requires a misrepresentation of *present* fact.[111] Furthermore, "Delaware law holds that a plaintiff 'cannot "bootstrap" a claim of breach of contract into a claim of fraud merely by

---

[110] *Abry P'rs V*, 891 A.2d at 1050.

[111] *MicroStrategy Inc. v. Acacia Research Corp.*, 2010 WL 5550455, at *15 (Del. Ch. Dec. 30, 2010).

54

alleging that a contracting party never intended to perform its obligations.'"[112]  For these reasons, the courts have imposed a particularly demanding requirement for alternatively pled fraudulent inducement claims:

> [W]hen a plaintiff pleads a claim of promissory fraud, in that the alleged false representations are promises or predictive statements of future intent rather than past or present facts, the plaintiff must meet an even higher threshold.  In this situation, the plaintiff "must plead *specific facts* that lead to a reasonable inference that the promisor had no intention of performing at the time the promise was made."[113]

Nederlander's pleadings lack the specific factual allegations required to support a reasonable inference that Mrs. Hays never intended to comply with the alleged promise and that, in fact, her statement was a lie when she made it.  The allegation in the Counterclaim and Third Party Complaint is completely conclusory:  "These representations were false when made."[114]  In addition, Nederlander's own allegations that the parties attempted over time to finalize the rent and duration terms of the renewed lease undermine its fraudulent inducement theory.  In that regard, I note that there are no

---

[112]    *Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *15 (Del. Ch. Dec. 22, 2010) (quoting *Iotex Commc'ns, Inc. v. Defries*, 1998 WL 914265, at *4 (Del. Ch. 21, 1998)); *see also MicroStrategy Inc.*, 2010 WL 5550455, at *17 ("In other words, a plaintiff cannot state a claim for fraud simply by adding the term 'fraudulently induced' to a complaint or alleging that the defendant never intended to comply with the agreement at issue at the time the parties entered into it.").

[113]    *MicroStrategy Inc.*, 2010 WL 5550455, at *15 (emphasis added) (quoting *Grunstein v. Silva*, 2009 WL 4698541, at *13 (Del. Ch. Dec. 8, 2009)).

[114]    C & TP Compl. ¶ 118; *id.* ¶ 65 ("Mrs. Hays had lied about her intention to continue leasing the Curran to SHN or, alternatively, that she had changed her mind and no longer intended to abide by the purchase-lease agreement . . . .").

allegations that Mrs. Hays's initial offer was so outrageous as to indicate that she never intended to fulfill the promise. To the contrary, Nederlander alleges that it anticipated an initial high-rent offer consistent with its view of how the *contract* negotiations would progress. Thus, I conclude that Count III must be dismissed.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in part. Specifically, Count I is dismissed to the extent that it asserts a claim for waste, Count III is dismissed in its entirety, and Count V is dismissed as against Dr. Hays. In all other respects, the motion is denied.

**IT IS SO ORDERED.**